UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARLON EZELL,

     Petitioner,     Case No. 1:20-cv-1232

v.             Honorable Hala Y. Jarbou

GREGORY SKIPPER,

     Respondent.

_____/

## OPINION

   This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

## Discussion

### I.  Factual allegations

   Petitioner Marlon Ezell is incarcerated with the Michigan Department of Corrections at the Michigan Reformatory (RMI) in Ionia, Ionia County, Michigan. On October 5,

2017, following a three-day jury trial in the Muskegon County Circuit Court, Petitioner was convicted of armed robbery, in violation of Mich. Comp. Laws § 750.529, and use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On December 19, 2017, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to a prison term of 20 to 30 years for armed robbery, to be served consecutive to a prison term of 2 years for felony-firearm.

Petitioner was tried jointly with a co-defendant, Darnell Durden.  Durden was convicted of the same crimes, and received the same sentences.  Durden's sentences, however, were to be served consecutively to sentences for which Durden was on parole at the time he committed the armed robbery.  *See* https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdoc Number=505538  (visited Dec. 29, 2020).

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

> Testimony established that Kim Westerland, Kevin Westerland, Jonathan Robertson, and Paul Robertson shared a home in Muskegon, Michigan.  Kim and Kevin had medical marijuana patient cards and grew marijuana in the home.
>
> In the evening of October 23, 2016, Deshawn Brown arranged to purchase a quarter pound of marijuana from Thomas Roberts, who was an acquaintance of Kim and Kevin.  Roberts arranged for Kim to sell the marijuana to Brown at Kim's home. Roberts walked to the home with Brown, and Kim let them inside.  While Kim was weighing out the marijuana in the kitchen, Brown went to the door and purportedly let three other men inside.  Testimony established that Ezell and Durden were two of the three men.  Brown and his three companions forced the home's occupants into the kitchen at gunpoint, robbed the home of the marijuana, and took cash. Police officers arrested Brown and Ezell that night and later located Durden.  The fourth participant in the robbery had not been caught by the time of trial.

(Mich. Ct. App. Op., ECF No. 2-1, PageID.101.)  Petitioner asks the Court to rely on the "Statement of Facts" section of his court of appeals' brief.  (Pet'r's Br., ECF No. 2, PageID.27; Pet'r's Appeal Br., ECF No. 2-1, PageID.49-57.)  The facts set forth therein provide more detail.

They are not inconsistent with the brief statement provided by the court of appeals; but they do highlight the irreconcilable inconsistencies between the testimony provided by Kim Westerland, Kevin Westerland, Paul Robertson, and Deshawn Brown.[1]

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals.  In the brief prepared by counsel, Petitioner raised two issues, the same issues raised as habeas grounds I and II below.  In a *pro per* supplemental brief, Petitioner raised four additional issues, the same issues raised as habeas grounds III through VI below.  By unpublished opinion issued February 28, 2019, the Michigan Court of Appeals affirmed the trial court.

Petitioner then filed a *pro per* application for leave to appeal in the Michigan Supreme Court.  (Appl. for Leave to Appeal, ECF No. 2-1, PageID.109-121.)  Petitioner raised the same six issues he raised in the court of appeals and now raises in this Court.  (*Id*.)   On November 26, 2019, the Michigan Supreme Court denied leave to appeal.  *People v. Ezell*, 925 N.W.2ds 347 (Mich. 2019).

On or about December 18, 2020, Petitioner filed his habeas corpus petition raising six grounds for relief, as follows:

I.     The prosecutor failed to present sufficient evidence to prove beyond a reasonable doubt that Petitioner was guilty of armed robbery and felony firearm, where there was no physical evidence that associated Petitioner with this offense, Petitioner was not identified with this offense, and Petitioner was not identified as being a perpetrator "beyond a reasonable doubt" where the identification testimony was wholly contradictory.

II.    Plain error was committed when irrelevant and highly prejudicial other bad acts evidence was being sent back to prison.  Alternatively, defense trial

---

[1] Deshawn Brown testified at the trial of Petitioner and Durden.  He reported that both participated in the armed robbery and both carried handguns.  Brown was sentenced as a third habitual offender to 8 to 30 years for armed robbery to be served concurrently with a sentence of 6 to 10 years for felon in possession of a firearm and consecutively to a 2-year sentence for felony-firearm.   See  https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber =505538 (visited December 29, 2020).

3

counsel rendered constitutionally ineffective assistance by failing to object to the testimony.

III.     Petitioner was subject to an improper identification procedure that was unnessar[il]y suggestive and conduc[]ive to a[n] irreparable mistaken identification that it amounted to a denial of his right to due process.

IV.     Petitioner argues that the trial judge abused his discretion in allowing the joinder of trial with co[defendant] Durden and admitting the testimony of Detective of admission [sic] violating [Petitioner's] Six[th] Amendment right of confrontation.

V.     Petitioner argues that he is entitled to a remand under Lockridge because the sentencing court engaged in impermissible judicial fact finding in scoring offense variables.

VI.     Petitioner argues that he was denied the effective assistance of counsel where counsel failed to strike a biased juror and failed to object to the introduction of the non-testifying co-[defendant's] statement into the trial.

(Pet., ECF No. 1, PageID.3-9.)

## II.     AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).   The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).   An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 574 U.S. 1, 4 (2014); *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).   Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their

adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Petitioner has chosen to rely on the arguments he presented in the Michigan Court of Appeals in presenting his claims to this Court.  He adds some habeas gloss to those arguments when he states: "Petitioner contends that the decisions of the Michigan Courts exhibit an objectionably unreasonable application of clearly established federal law as cited to specifics, in the brief in support of this petition, attached herewith and incorporated hereto." (Pet., ECF No. 1, PageID.3-9.)  As set forth fully below, in most instances, adding that gloss does not suffice to address the Michigan Court of Appeals' resolution of Petitioner's claims.

## III.   Discussion

### A.     Sufficient evidence (habeas ground I)

Petitioner contends that the prosecutor failed to present sufficient evidence that Petitioner was one of perpetrators of the armed robbery.  Petitioner's argument is premised on the inconsistencies between the descriptions of the crime and the perpetrators offered by the victims and then the further inconsistencies between the victims' versions and that of Petitioner's co-

conspirator, Deshawn Brown.  The Michigan Court of Appeals reviewed the testimony of the three

victims, acknowledging the inconsistencies between them:

> Although there were some discrepancies, these three witnesses agreed on several important points.  All three agreed that two of the men—Brown and the heavy set man—came into the kitchen and that the two other men went into the living room.  They also agreed that at least two men were armed, that the men worked in concert to steal the marijuana, and that the men used force or threats of violence to accomplish the robbery.  Kim could not identify Ezell and Durden at trial, but—contrary to Ezell's suggestion on appeal—he did not testify that they were not involved.  Rather, he stated that they were not the men who initially came into the kitchen.  Thus, his testimony did not contradict Kevin's testimony.  And Kevin emphatically identified Ezell as one of the men who came into the living room.  Indeed, he stated that Ezell put a gun in his face, ordered him to the kitchen, and struck him when he moved too slowly.  Paul's testimony conflicted with Kevin's as to whether Ezell escorted Kevin to the kitchen, but Paul admitted that he had been frozen with fear in the kitchen and then struck by the heavy set man before getting down on the floor.  Nevertheless, he identified Durden as one of the two men who went to the living room and he testified that Ezell was the man who threatened them.  Thus, two of the three robbery victims identified Durden and Ezell as coperpetrators of the armed robbery and the one who could not identify them admitted that he did not get a good look at the two men who went into the living room.  For that reason, he could neither confirm nor deny whether they were the two men who went into the living room.

(Mich. Ct. App. Op., ECF No. 2-1, PageID.102)  The appellate court also considered the testimony

of Brown:

> In addition to the victims' testimonies, Brown testified at trial and identified Ezell as one of the men who assisted him in the robbery.  Brown's testimony appeared at times to be implausible and was highly inconsistent with the testimonies of the victims.  For example, Brown suggested that the robbery was not planned ahead of time.  Indeed, he testified that he had no idea that there was going to be a robbery until Ezell appeared at the door of the home and handed him a weapon.  Yet his other statements belie the purported lack of planning.  Brown testified that he arranged a large marijuana purchase and used Malachi Walker's phone to do so.  He further stated that Walker's close friends, Ezell and Durden, just happened along at that moment.  They then showed up at the house fortuitously just as Brown was approaching the door.  The other testimony and evidence further showed that the four men split up, took control of the home's occupants, searched the home for marijuana, and effected their escape in relatively short order.  These statements, when considered with the other testimony and evidence, strongly suggest that the marijuana purchase was a ruse and that Brown planned the robbery with his coconspirators.

Brown also denied that there was a fourth coconspirator, despite the fact that the victims all agreed that there was a fourth perpetrator who was heavy set and stayed in the kitchen the whole time.  Brown claimed that Ezell was the only one in the kitchen and that he stood over the victims while Brown and Durden searched for the marijuana.  But he also stated that Ezell handed him his gun by that point.  So— in his version—the unarmed Ezell stood guard over the four victims by himself while Brown and Ezell searched the living room for marijuana.

(*Id*.)  The court also identified circumstantial evidence that supported the verdict:

Finally, there was circumstantial evidence tending to corroborate the testimonies implicating Ezell in the robbery.  Testimony showed that police officers used a canine to track the perpetrators from the home where the robbery occurred to Walker's home.  When the officers arrived, they observed three men standing near a grill.  After an officer ordered the men to the ground, one of the men dropped a handgun and all three tried to flee.  Ezell was apprehended after fleeing to a nearby park.  The officers also found a large quantity of marijuana including marijuana in jars that the evidence tended to show came from the robbery at issue.  The fact that Ezell was in the company of two of the perpetrators and the stolen marijuana when the officers arrived within a relatively short time of the robbery—while in theory explainable as a coincidence—also tended to corroborate the evidence that he was a participant in the robbery.  See *Hardiman*, 466 Mich at 428.

(*Id*., PageID.103.)[2]

The court then evaluated the evidence to determine whether it was sufficient to support the jury's determinations of guilt beyond a reasonable doubt.  The appellate court applied the following standard: "This Court reviews a challenge to the sufficiency of the evidence by examining the 'record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime were proved beyond a reasonable doubt.'" (*Id*., PageID.101) (citation omitted).  The appellate court elaborated as follows:

As our Supreme Court has emphasized, this Court must not interfere with the fact-finder's role in deciding the weight and credibility to give to a witness's testimony

---

[2] The court of appeals' determinations regarding the nature of the testimony at trial are presumed correct.  Petitioner may rebut them with clear and convincing evidence.  He does not make any effort to do so.  Instead he contends that the facts identified by the court of appeals were not sufficient to support a verdict of guilt beyond a reasonable doubt.  Petitioner focuses specifically on the issue of his identity as a perpetrator of the robbery, not whether the robbery actually occurred.

when reviewing the sufficiency of the evidence; this Court may not "determine the credibility of witnesses"—"no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997). Rather, when the question is one of credibility posed by diametrically opposed versions of the events in question, courts must leave the test of credibility with the trier of fact. See *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998). This Court will not only defer to the jury's assessment of the weight and credibility to be afforded the various witnesses' testimonies, it must resolve all conflicts in the evidence in favor of the prosecution. See *Wolfe*, 440 Mich at 515 (stating that the reviewing courts must put the evidence that was most favorable to the prosecution together and discard the rest).

(Mich. Ct. App. Op., ECF No. 2-1, PageID.103.)  Although the court of appeals cited state authority for the standard, that state authority ultimately tracks back to the United States Supreme Court standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979).

In *Jackson*, the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401-02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the

Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).   This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.   *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals obviously applied the correct standard to resolve Petitioner's sufficiency claim.   Moreover, the court applied the standard consistently with the requirements of *Jackson*.   The court of appeals reviewed the evidence that identified Petitioner as one of the perpetrators of the armed robbery, and reasonable inferences from that evidence, in a light that favored the prosecution and concluded that the evidence was sufficient:

> This testimony [of the victims] was—standing alone—sufficient to permit a reasonable finder of fact to find beyond a reasonable doubt that Ezell participated in the robbery and that he carried or possessed a firearm during the commission of the robbery.   See MCL 750.227b(1); *Gibbs*, 299 Mich App at 490-491.   As noted, there were some inconsistencies between the testimonies of Paul and Kevin with regard to the specific actions taken by Ezell during the robbery, but both men agreed that Ezell participated.   A reasonable jury could find that Paul and Kevin correctly identified Ezell as a participant, but that Kevin's account of Ezell's specific actions better described Ezell's role.   That is, the jury could accept Paul's identification of Ezell as the perpetrator who threatened them all, which was consistent with Kevin's testimony, but still conclude that Paul was mistaken when he identified Durden as the man who escorted Kevin to the kitchen.   See *People v Bowyer*, 108 Mich App 517, 522; 310 NW2d 445 (1981) ("It is for the jury to decide who to believe and what testimony of a particular witness to believe.").   Further, a reasonable jury could infer that Kim could not identify Ezell because Ezell was one of the two men who went into the living room and not because he was not in fact present for the robbery.   See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002) (stating that it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences").   When examined in the light most favorable to the prosecution, see *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), the victims' testimonies were together sufficient to support a finding beyond a reasonable doubt that Ezell was one of the perpetrators of the armed robbery, see *Roper*, 286 Mich App at 83.

*       *       *

10

Brown's testimony was so implausible in light of the victim's testimony that a reasonable jury could infer that he was lying about some of the events in order to protect the fourth perpetrator and to minimize his own culpability.  But even so, the jury was not required to reject all of Brown's testimony.  As this Court has recognized, even liars tell many truths, and it is for the jury to "'sift the true from the false.'"  *People v Miceli*, 35 Mich App 176, 178; 192 NW2d 335 (1971), quoting *Jewell v Kelley*, 155 Mich 301, 305; 118 NW 987 (1909).  For that reason, contrary to Ezell's claims on appeal, the jury could reject Brown's recitation of Ezell's involvement to the extent that his testimony conflicted with the victims' testimonies but still find him credible with regard to his claim that Ezell did in fact participate in the robbery.

*     *     *

Brown's testimony that Ezell tried to bribe Brown into taking the fall for the robbery, used threats against Ezell, and coerced him into submitting a letter of retraction were also evidence that he was conscious of his guilt.  See *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996) (stating that evidence that the defendant threatened a witness is admissible to prove that the defendant was conscious of his or her guilt); *People v Salsbury*, 134 Mich 537, 569; 96 NW 936 (1903) (stating that "evidence that a defendant has attempted to suppress testimony or induce perjury is admissible, and tends to show guilt").  And the evidence that he was conscious of his guilt lent credibility to Brown's identification of Ezell as a perpetrator.  The testimony that Ezell tried to influence Brown also strongly undermined the credibility of Brown's letter of retraction.  It was for the jury to decide the import of the evidence that Ezell tried to influence Brown's statements and testimony.  See *Sholl*, 453 Mich at 740.  The jury was free to reject—and apparently did reject—Brown's letter of retraction as a complete fabrication drafted at Ezell's instigation.  This Court will not second guess the jury's assessment of the weight and credibility to be given the letter.  See *Mehall*, 454 Mich at 6.

There was significant eyewitness testimony that identified Ezell as one of the perpetrators of the armed robbery at issue.  That testimony was sufficient to allow a reasonable jury to find beyond a reasonable doubt that Ezell was one of the perpetrators of the armed robbery.  See *Roper*, 286 Mich App at 83.

(Mich. Ct. App. Op., ECF No. 2-1, PageID.102-103.)

Petitioner invites this Court to turn the *Jackson* standard on its head by viewing the evidence in a light that favors him and then invading the province of the jury by drawing different inferences and making different credibility determinations.  *Jackson* holds that it is the jury's province to draw reasonable inferences from basic facts to ultimate facts. 443 U.S. at 319. In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining

what distinguishes a reasoned inference from 'mere speculation.'" *Id*. at 655.  The Court described

a reasonable inference as an inference that a rational jury could make from the facts.  Certainly,

the inferences identified by the court of appeals rationally flow from the underlying facts.  The

inferences are not compelled by those facts.  The inferences may not even be more likely than not;

they are simply rational.  *Id*. at 656.  To succeed in his challenge, Petitioner must show that the

identified inferences are irrational. He has not. Instead, his argument depends on ignoring the

reasonable inferences identified by the court of appeals and adopting other inferences that favor

Petitioner.

Petitioner has failed to show that the court of appeals' determination of Petitioner's

sufficiency claim is contrary to, or an unreasonable application of, the clearly established federal

law of *Jackson*.  Therefore, he is not entitled to habeas relief on his sufficiency of the evidence

claim.

**B.     Prior bad acts (habeas ground II)**

Petitioner next complains that Brown's testimony that Ezell offered Brown money

to "take the case for them so that they wouldn't go back to prison,"  (Pet'r's Appeal Br., ECF No.

2-1, PageID.71), was improper character evidence of a prior bad act.  Petitioner contends that the

admission of that prior bad act evidence deprived him of a fair trial and his due process rights.

The court of appeals rejected Petitioner's contention, as a matter of state law:

> Generally, testimony and evidence of other acts are not admissible to prove that the
> defendant has bad character and that he or she acted in conformity with his or her
> bad character.  *Roper*, 286 Mich App at 91; see also MRE 404(a) (providing
> generally that "[e]vidence of a person's character or a trait of character is not
> admissible for the purpose of proving action in conformity therewith") and MRE
> 404(b)(1) (stating that "[e]vidence of other crimes, wrongs, or acts is not admissible
> to prove the character of a person in order to show action in conformity therewith").
> As such, "[i]f the proponent's only theory of relevance is that the other act shows
> defendant's inclination to wrongdoing in general to prove that the defendant
> committed the conduct in question, the evidence is not admissible."  *People v
> VanderVliet*, 444 Mich 52, 63; 508 NW2d 114 (1993).  Testimony and evidence

12

concerning other acts may, however, properly be admitted to prove something other than character, even though the testimony and evidence also implicates character. *Roper*, 286 Mich App at 92.  While MRE 404(b) lists permissible uses for other-acts evidence, that list is not exhaustive.  See *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000).  As such, other-acts evidence may be admissible if it is relevant for any purpose other than to prove action in conformity with character.  *Id*.  At trial, the prosecutor elicited testimony from Brown about several incidents in which Ezell tried to directly influence Brown to mislead police officers.  Brown testified that Ezell threatened him, offered him money to take the fall for the robbery, and later caused him to draft a letter of retraction that implicated unknown persons in the crime.  The prosecutor could properly present that evidence to establish that Ezell was conscious of his guilt.  See *Sholl*, 453 Mich at 740; *Salsbury*, 134 Mich at 569.  Because the testimony was admissible for a purpose other than to prove character and action in conformity with character, MRE 404(a) and MRE 404(b)(1) did not apply.  See *Sabin*, 463 Mich at 56. Ezell has not identified any other bases for excluding the evidence.

(Mich. Ct. App. Op., ECF No. 2-1, PageID.103-104.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  502 U.S. at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders*, 221 F.3d at 860. Petitioner has not met this difficult standard.

There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75.  The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

Because there was no constitutional violation in the admission of evidence (bad acts), the state court decision was "far from" an unreasonable determination of the facts in light of the evidence presented.  *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

14

## C.     Suggestive identification procedure (habeas ground III)

Petitioner contends the victim's identification of him violated due process because it occurred under suggestive circumstances.  Specifically, Petitioner claims that he was part of a corporeal line-up at the police station.  He contends that the detective placed four witnesses—the victims—in a main room to wait to review the line-up.  Petitioner notes that the line-up occurred in a public hallway without the presence of counsel.  According to Petitioner, "each witness was in a situation w[h]ere they could have heard who was identified before them, leaving the opportunity that, at the time each of them [was] done and left to go back in the waiting room, . . . they could know who the other before them identified."  (Pet'r's *Pro Per* Supp. Br., ECF No. 2-1, PageID.84.)

The Michigan Court of Appeals rejected Petitioner's claim because it was factually unsupported:

> On appeal, Ezell challenges Kevin's identification of him at a corporeal lineup. Ezell does not, however, argue that the makeup of the corporeal lineup was unduly suggestive, nor does he argue that the officers who conducted the lineup suggested a particular identification.  Rather, he maintains that the officers conducted the lineup in a way that allowed Kevin to hear any identifications made by one of the earlier witness also brought to the lineup.
>
> Detective Matthew Kolkema testified that he participated in the corporeal lineups held on the morning of October 25, 2016.  He stated that the viewing window through which the witnesses looked at the group of persons to be identified was in a hallway.  He said that the general public could not enter the hallway from the waiting room because the door to the hall was locked.  There were four witnesses there that day.  The four witnesses—the two Robertsons, Roberts, and Kevin— waited in the main room before being taken to the lineup.  The first witness was Roberts.  An officer escorted him through the door and into the hall to look through the window at the lineup with Ezell in it.  He was then brought into another room to ensure that he did not have any contact with a subsequent witness.  They followed this same procedure with the next witnesses.  Kolkema conceded that a witness who had already finished his viewing could possibly have heard a later witnesses' identification from the room where the witness was asked to wait.  He stated, however, that a witness would not have been able to hear any identification made by a witness before he was escorted down the hall.

15

Ezell's claim that the officers used an unduly suggestive pretrial identification procedure with Kevin depends entirely on his contention that Kevin could have heard an earlier witness's identification of him, which in turn tainted Kevin's identification. Yet Kolkema testified that it was not possible for a witness to hear an earlier witness' identification; it was only possible that a witness who had already conducted his lineup might have heard a subsequent witness's identification. Because there was no evidence that Kevin could have heard an earlier identification, Ezell has not shown that his lineup involved any suggestive procedures. See *Kurylczyk*, 443 Mich at 302-303.

(Mich. Ct. App. Op., ECF No.104.)

Petitioner never responds to the court of appeals' factual determinations. In his application for leave to appeal to the Michigan Supreme Court he shifts the focus of his argument to a claim that he was entitled to counsel at the line-up—a claim that he does not repeat in his habeas petition.[3] In his habeas brief, he simply ignores the appellate court's factual determinations. (Pet'r's Br., ECF No. 2, PageID.31-33.) The factual determinations are presumed to be correct. That presumption is conclusive because Petitioner has made no effort to rebut it.

Due process provides a "check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). The principle of due process "prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification." *United States v. Peterson*, 411 F. App'x 857, 864 (6th Cir. 2011) (citing *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000)).

In determining whether an unacceptable risk of misidentification exists, courts employ a two-step analysis. *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall*

---

[3] Petitioner's abandonment of the issue is understandable. The constitutional right to counsel attaches only upon the initiation of adversary judicial proceedings, such as formal charge, preliminary hearing, indictment, information, or arraignment. *United States v. Gouveia*, 467 U.S. 180 (1984); *Kirby v. Illinois*, 406 U.S. 682 (1972) (no right to counsel in a pre-indictment line-up).

*v. Denno*, 388 U.S. 293, 301-02 (1967), and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)).

The first step requires a determination as to whether the identification was "unnecessarily

suggestive." *Id.* The second step of the inquiry requires consideration of a number of factors,

including

> The factors considered in making this determination include: "1) the witness's
> opportunity to view the criminal at the time of the crime; 2) the witness's degree of
> attention; 3) the accuracy of the witness's prior description of the criminal; 4) the
> level of certainty demonstrated at the confrontation; and 5) the time between the
> crime and the confrontation."

*United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007) (citing *United States v. Beverly*,

369 F.3d 516 (6th Cir. 2004)); *see also Haliym*, 492 F.3d at 704 (citing *Manson v. Brathwaite*, 432

U.S. 98, 114 (1977), and *Biggers*, 409 U.S. at 199-200). If "the first step of the requisite analysis

ends in the government's favor, [the court] need not address" the second step of the inquiry. *United*

*States v. Stamper*, 91 F. App'x 445, 462 (6th Cir. 2004).

Based on the factual determinations of the Michigan Court of Appeals, Petitioner's

claim that the line-up identification was unduly suggestive fails at the first step. The Supreme

Court has expressly stated that identifications are often inherently "suggestive." *See Perry*, 565

U.S. at 244 ("Most eyewitness identifications involve some element of suggestion. Indeed, all in-

court identifications do."). But the fact that an identification procedure is suggestive does not,

standing alone, implicate due process protections. Rather, there must be "improper law

enforcement activity" before a suggestive identification requires further scrutiny. *Id*. at 232-33.

Petitioner offers no evidence of "improper law enforcement activity" in connection with the

corporeal line-up. Therefore, Petitioner cannot show that the rejection of his claims relating to the

identification is contrary to or an unreasonable application of clearly established federal law.

### D.    Joinder and confrontation

Petitioner next contests the joinder of his prosecution with the prosecution of Durden.  He bases his challenge on a claim that he was denied the opportunity to confront the witnesses against him.  The Michigan Court of Appeals resolved the challenge as follows:

> Public policy favors joint trials, and a defendant who wishes to have a separate trial must make an affirmative showing that the joint trial will prejudice his or her substantial rights.  *Etheridge*, 196 Mich App at 53.  On appeal, Ezell claims that the joint trial violated his right to confront the witnesses against him.  See US Const, Am VI.  More specifically, he maintains that the admission of Durden's statement implicated him and, because Durden exercised his right not to testify, the admission of the statement at a joint trial prejudiced his rights.
>
> The Sixth Amendment right to confront the witnesses against an accused applies to witnesses who "bear testimony" against the accused.  *People v Bruner*, 501 Mich 220, 227; 912 NW2d 514 (2018) (quotation marks and citation omitted).  As our Supreme Court has observed, joint trials can present confrontation problems: "Joint trials with a single jury present a special problem.  Some evidence may be admissible as to one defendant but violate a codefendant's confrontation right.  When that is the case, a court must either exclude the testimony or take measures to eliminate the confrontation problem." *Id*.  When a codefendant's statement "was not incriminating on its face, and became so only when linked with evidence introduced later at trial," it is not necessary to exclude the statement.  *Richardson v Marsh*, 481 US 200, 208; 107 S Ct 1702; 95 L Ed 2d 176 (1987). "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id*. at 211.  Thus, a statement by a defendant may be admitted at a joint trial without violating the Confrontation Clause if the statement has been redacted in such a way that it does not implicate the codefendant.  See *Bruner*, 501 Mich at 227-228.
>
> At trial, Kolkema testified that he tried to interview Durden after Durden's arrest, but Durden refused to give a statement.  Kolkema, however, provided a cell phone to Durden and left the room.  He then monitored Durden's activities from another room.  He heard Durden make a call in which he told the other person to be "strong," "not to cry," and then said that he would take a "COBBS"[1] deal if he got the opportunity because he did not want to "do more than six years."
>
> Although Durden's statement about a *Cobbs* deal implied that Durden was conscious of his own guilt, among other possible inferences, nothing within his statement implicated Ezell in any way.  Durden did not identify Ezell and did not describe any details that might—when considered with other evidence—directly implicate Ezell in the robbery.  Under these circumstances, there was nothing

within the statement that could be fairly characterized as having "borne testimony against [Ezell] in any Sixth Amendment sense." *Bruner*, 501 Mich at 228.  Thus, the admission of this statement did not violate Ezell's right to confront Durden.

Ezell's only basis for challenging the joint trial involved Ezell's claim that the joint trial prevented him from confronting Durden about his statement.  Because Durden's statement did not involve testimony against Ezell, Ezell had no right to confront Durden.  Ezell has not shown that the joint trial prejudiced his substantial rights.  See *Etheridge*, 196 Mich App at 53.  There was no plain error. See *Carines*, 460 Mich at 763.

[1] A *Cobbs* deal refers to a form of sentencing negotiation described in *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

(Mich. Ct. App. Op., ECF No. 2-1, PageID.104-105.)  Once again, Petitioner does not address the court of appeals' resolution of his claim when he presents the issue for habeas review.  He simply repeats his state appellate-court arguments.

There is no due process right to a trial separate from one's co-defendants.  The propriety of severance generally is governed by state law.  *See* Mich. Ct. R. 6.120, 6.121; *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002).  "[A] state trial court's alleged abuse of discretion [in denying severance], without more, is not a constitutional violation."  *Stanford v. Parker,* 266 F.3d 442, 459 (6th Cir. 2001).   Because severance is a state-law issue, the habeas court may not grant habeas relief "unless the 'error rises to the level of depriving the defendant of fundamental fairness in the trial process.'"  *Hutchison*, 303 F.3d at 731 (quoting *Serra v. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993)).

Petitioner relies on one circumstance where the Supreme Court has determined that separate trials are constitutionally required:  "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Bruton v. United States*, 391 U.S. 123, 135-36 (1968).  The extrajudicial statement that incriminates the defendant cannot be tested by cross-examination; therefore, in that circumstance, the defendants rights under the Confrontation Clause are

compromised.  *Id.* at 136-37.  In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court recognized an important limit to the reach of *Bruton*.  The Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  *Richardson*, 481 U.S. at 211 (footnote omitted).  The *Richardson* Court explained that the rationale of *Bruton* does not validly apply where the confession does not name the defendant.  *Id.*

The Michigan Court of Appeals expressly applied the clearly established federal law of *Richardson* when it rejected Petitioner's claim.  Petitioner has failed to show how the state court's resolution is contrary to, or an unreasonable application of, *Richardson* or *Bruton*.  Moreover, Petitioner does not challenge the factual determination which lies at the heart of the state court's analysis—that the extrajudicial statement of Durden did not implicate Petitioner at all.  Thus Petitioner has failed to demonstrate that he is entitled to habeas relief on this claim.

### E.    Judge-found facts at sentencing

Petitioner argues that the judge found facts, facts beyond those that follow from the jury's verdict, at sentencing that were used to determine Petitioner's guidelines score and, thus, his sentence.  The court of appeals rejected Petitioner's claim because the guidelines were only advisory at the time Petitioner was sentenced.  Using judge-found facts in support of advisory guidelines, the appellate court concluded, did not interfere with Petitioner's Sixth Amendment right to a jury.

Petitioner bases his argument on the line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and including *Ring v. Arizona*, 53 U.S. 584 (2002), *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Alleyne v. United States*, 570 U.S. 99 (2013).  In *Apprendi*, the Supreme Court held that "[o]ther than the fact

20

of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490. *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence.  In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing-guideline scheme, under which the maximum penalty could be increased by judicial fact-finding.  The *Blakely* Court held that the state guideline scheme violated the Sixth and Fourteenth Amendments, reiterating the rule that any fact that increases the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt."  *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

Thereafter, in *Alleyne*, 570 U.S. 99, the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences.  In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), the Michigan Supreme Court held that, under *Alleyne*, the Michigan sentencing guidelines scheme violates the Sixth Amendment, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables [] that *mandatorily* increase the floor of the guidelines minimum sentence range." *Lockridge*, 870 N.W.2d at 506 (emphasis in original).  The Court's remedy for the unconstitutionality of the Michigan guidelines was to sever and strike the mandatory component of the guidelines and make the guidelines advisory only.  *Id.* at 520-21 (relying on *Booker,* 543 U.S. at 264-265 (holding that the remedy for the unconstitutionality of the mandatory federal sentencing guidelines was to sever only the mandatory component, still requiring courts to consider the guidelines, but making them advisory and subject to review for reasonableness)).

On August 24, 2018, the Sixth Circuit agreed with the *Lockridge* analysis. *Robinson v. Woods*, 901 F.3d 710 (6th Cir. 2018).  The *Robinson* court held that the Supreme

Court's decision in *Alleyne* clearly established that Michigan's mandatory minimum sentencing scheme was unconstitutional. *Robinson*, 901 F.3d at 714. The court reasoned that, "[]a]t bottom, Michigan's sentencing regime violated *Alleyne*'s prohibition on the use of judge-found facts to increase mandatory minimum sentences. *Id.* at 716 (citing *Alleyne*, 570 U.S. at 111-12).

In the instant case, Petitioner was sentenced in 2017, more than four years after the Supreme Court decided *Alleyne*. *Alleyne* therefore was clearly established at the time of Petitioner's sentence. However Petitioner also was sentenced more than two years after *Lockridge* was decided. As a result, at the time Petitioner was sentenced, the sentencing guidelines no longer were mandatory, but advisory only.

Purely advisory applications of the guidelines do not run afoul of the Sixth Amendment. *See Booker*, 543 U.S. at 232 ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); *see also Apprendi,* 530 U.S. at 481-82 (reiterating that "'a sentence imposed by a federal district judge, *if within statutory limits,* is generally not subject to review'") (emphasis added) (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972)); *see also Reign v. Gidley*, 929 F.3d 777,  781 (6th Cir. 2019) ("But the constitutional error here was the mandatory application of the guidelines, not merely the consideration of judge-found facts."). Consideration of the Michigan sentencing guidelines minimum range was entirely discretionary at the time the trial court sentenced Petitioner. Because the guidelines were only discretionary, the consideration of judge-found facts does not implicate Petitioner's constitutional rights. The Michigan Court of

Appeals' rejection of Petitioner's claim, therefore, was neither contrary to, nor an unreasonable application of, *Alleyne*.  Once again, Petitioner is not entitled to habeas relief.

### F.    Ineffective assistance of counsel

Finally, Petitioner complains that his counsel rendered ineffective assistance when counsel failed to strike a biased juror and failed to object to the introduction of Durden's out-of-court statement through the testimony of Detective Kolkema.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  The court of appeals applied the *Strickland* standard when rejecting Petitioner's ineffective assistance claims.  (Mich. Ct. App. Op., ECF No. 2-1, PageID.105.)

When a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at

23

105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

### 1.   Failure to strike a biased juror

The court of appeals addressed Petitioner's claim that his counsel was ineffective for failing to strike a purportedly biased juror as follows:

> Ezell first claims that defense counsel was ineffective for failing to strike a biased juror, or, at the very least, to further investigate the potential juror's bias.
>
> On the first day of trial, the trial court asked 13 of the potential jurors to be seated for voir dire.  The court recorder recorded the names of those 13 potential jurors. The trial court also admonished the other potential jurors to pay attention because they might be called if one the 13 were to be excused.  The parties then questioned the 13 potential jurors.  Thereafter, the court recorder appeared to indicate the name of a potential juror if the potential juror was one of the 13 seated for voir dire and identified the potential juror as "unknown" if not one of the 13 seated jurors.
>
> After questioning the potential jurors for some time, Ezell's defense counsel asked the potential jurors about whether they would hold it against defendants if they chose to exercise their right not to testify.  An unknown potential juror answered, "I think that I would have a hard time believing if they're not trying to stand up for themselves."  After that colloquy, the lawyers all agreed that they did not wish to strike any of the 13 jurors for cause.  Thereafter, the parties peremptorily excused several jurors, and the trial court asked each of the subsequently called potential jurors if he or she heard all of the previously asked questions and whether the juror had heard anything that would create a problem for the juror.  The court also asked each juror if he or she could be fair and impartial.  Each of the substituted potential jurors who ended up on the jury answered affirmatively.
>
> Ezell had the burden to prove the factual predicate for his claim of ineffective assistance of counsel.  See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).  Ezell did not meet that burden.

There is no evidence that the potential juror who expressed concern about a defendant's failure to testify was part of the original 13 potential jurors selected for voir dire. Indeed, the fact that the potential juror was identified as "unknown" suggests that the juror was not part of the original 13 persons selected. Further, there is no record evidence that the unknown juror eventually replaced an excused juror. Even if the unknown potential juror did end up being selected, there is no evidence that he or she was not subsequently peremptorily excused. In the absence of evidence that the juror actually served on Ezell's jury, this Court cannot fault defense counsel for failing to further investigate or asking to excuse the juror. Ezell's defense counsel would have no need to further explore the potential juror's bias if the unknown potential juror never got selected for the jury. Likewise, there would be no need to further explore the potential juror's bias if defense counsel— or any of the other lawyers—excused the potential juror peremptorily. See *Riley*, 468 Mich at 142 (stating that defense counsel has no obligation to make a meritless request). Ezell failed to demonstrate that defense counsel's conduct of voir dire fell below an objective standard of reasonableness under prevailing professional norms or that he was prejudiced by defense counsel's failure to object. See *Gioglio*, 296 Mich App at 22.

(Mich. Ct. App. Op., ECF No. 2-1, PageID.105-106.) Petitioner has not responded to the court of appeals' resolution of the issue in his Michigan Supreme Court application for leave to appeal or in his habeas brief. Even here, Petitioner does not claim that the purportedly biased juror ended up on the jury.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . and to have the assistance of counsel for his defense." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

"The *voir dire* is designed 'to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520

(6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

*Voir dire* plays an important role in ensuring the impartiality of the jury selected:

> It is true that "[*v*]*oir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.  Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.  *Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950).  "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).  Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness."  *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

*Morgan v. Illinois*, 504 U.S. 719, 729-730 (1992) (parallel citations and footnote omitted).

It is well-established that jurors are presumed to be impartial.  *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723).  When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'"  *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *see also Miller v. Webb*, 385 F.3d 666, 673 (6th Cir. 2004).  The trial court must determine whether the juror demonstrates "actual bias," that is, "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."  *Miller*, 385 F.3d at 673 (internal quotations omitted).  "A juror's express doubt as to her own impartiality on *voir dire* does not necessarily entail a finding of actual bias.  The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on *voir dire*."  *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001) (citing *Patton*, 467 U.S. at 1032).  "It

is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723.  In evaluating the juror's ability to lay aside partiality, the Sixth Circuit has identified a number of important factors, including the following: "'the juror's own estimation of the relevance of [the information giving rise to her partiality]; any express indications of partiality by [the] juror . . . and the steps taken by the trial court in neutralizing this information.'" *Hughes*, 258 F.3d at 459 (quoting *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis,* 354 F.3d at 520 (citing *Patton,* 467 U.S. at 1036); *see also Sizemore v. Fletcher,* 921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)).  Petitioner bears the burden to establish the existence of juror bias which caused him to suffer actual prejudice.  *See Smith*, 455 U.S. at 215-17 (petitioner bears the burden to demonstrate that he suffered "actual bias" as a result of juror misconduct); *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000); *Sheppard v. Bagley*, 657 F.3d 338, 348-49 (6th Cir. 2011) (Batchelder, J. concurring).  Here, the Michigan Court of Appeals concluded that Petitioner had not established that factual predicate. He failed to demonstrate that the purportedly biased juror ended up on the jury.  That determination is presumed correct.  Petitioner could attempt to rebut the presumption with clear and convincing evidence.  He has not done so.

Because Petitioner failed to demonstrate that the purportedly biased juror ended up on his jury, the court of appeals determined that Petitioner could not meet either prong of the *Strickland* standard.  That determination is a reasonable application of *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this ineffective assistance of counsel claim.

27

### 2.      Counsel's failure to object to admission of Durden's out-of-court statement

Petitioner contends that his counsel should have objected to the introduction of Durden's telephone conversation because it violated Petitioner's Confrontation Clause rights.  The court of appeals determined that because Durden's statement did not amount to testimony against Petitioner, Petitioner "did not have the right to confront Durden about the statement, and defense counsel cannot be faulted for failing to object on that basis."  (Mich. Ct. App. Op., ECF No. 2-1, PageID.106.)  The appellate court's determination is entirely consistent with *Strickland* because "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial."  *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## IV.      Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating

that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.  Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:   January 7, 2021                             /s/ Hala Y. Jarbou
                                                                HALA Y. JARBOU
                                                                UNITED STATES DISTRICT JUDGE